LAW OFFICES
# David Wikstrom
250 WEST 55TH STREET, 17TH FLOOR
NEW YORK, NY 10019

E-MAIL: DAVID@DAVIDWIKSTROM.COM  
WWW.DAVIDWIKSTROM.COM

TELEPHONE: (212) 248-5511  
FACSIMILE: (212) 248-2866

January 28, 2025

The Honorable Victor Marrero  
United States District Judge  
Southern District of New York  
500 Pearl Street  
New York, NY 10007

      Re:  United States v. Eliesha Murray  
          24 CR 404 (VM)

Dear Judge Marrero:

      This letter is submitted in mitigation of sentence on behalf of Eliesha Murray, whose sentence will be imposed on February 6, 2025. Mr. Murray pleaded guilty on June 24, 2024 before U.S.M.J. Tarnofsky to one count of weapons possession by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). That plea exposed Mr. Murray to a statutory maximum potential prison term of 15 years. His plea agreement included a Guidelines stipulation with an advisory final imprisonment range of 27-33 months' imprisonment. The Presentence Investigation Report ("PSR") calculated the Guidelines for the offense conduct consistently with the parties' plea agreement. The Probation Department has recommended a sentence of 18 months' imprisonment. For the reasons set forth below, I believe that the circumstances of Mr. Murray's offense, in the context of his personal history and characteristics, warrant a sentence below the Guidelines range. Such a sentence would be appropriate, and sufficient to meet each of the statutory purposes of sentencing set forth in 18 U.S.C. §3553(b).

      **Introduction**

      Eliesha Murray was convicted of a felony in 2014 and released from prison in 2018. On the night of December 15, 2024, he climbed in the back of an Uber to go to the store. A traffic stop, conducted after the car had traveled two blocks, showed that he was not wearing his seatbelt, and—a few moments later—an investigatory frisk revealed that he had a handgun. This concludes the entirety of the "nature and circumstances of the offense" under 18 U.S.C. §3553(a)(1), the entirety of the offense conduct that brings Mr. Murray before the Court to be sentenced.

      Unlawful weapons possession is unquestionably serious. Mr. Murray would be the first to admit this. Indeed, his acceptance of responsibility was all but instantaneous: he waived a

preliminary hearing, waived discovery, waived indictment, and promptly entered his guilty plea.[1] He now comes before the Court for sentencing after spending the last year under home detention.

The focus of this sentencing submission is to address the <u>other</u> §3553(a)(1) factors, the history and characteristics of the defendant. Neither the description of the offense conduct, nor the defendant's rap sheet, convey the real picture of who Mr. Murray is, a man still struggling with the scars of tragedy and isolation from his childhood. His life choices have been molded and constrained by a complex and deeply troubling childhood, a childhood marked by mental health disorders, behavior problems, and custody. When Mr. Murray emerged from NYS prison in 2018 he was a 22-year old man who had spent eight of the previous ten years in prison, locked away for the entirety of his adolescence and early adulthood. Of that time, he had spent more than five years in solitary confinement, including twenty months at Rikers Island, and virtually all of his upstate time. DOCCS records show that in the years after Mr. Murray was sent upstate from Rikers, NYS prison officials sentenced him to a total of 53 months of solitary confinement, notwithstanding that he only had 37 months to serve.[2] He spent so much time in solitary confinement that he was later awarded a significant settlement from NYS, as a result of a successful class action lawsuit challenging the constitutionality of NYS DOCCS' disciplinary use of solitary confinement on juveniles, and on individuals with mental health disorders. And even before Mr. Murray spent those five years in prison for his first actual adult criminal case, he had sustained three juvenile OCFS custodial sentences totaling three and one-half years.[3] Indeed his first sentence to custody was when he was 12 years old, imposed in a case that started when he was 11. The sentence was for truancy. And throughout his life—before those juvenile placements, during his time in prison and through his years on NYS parole—Mr. Murray has suffered from significant mental health problems including suicidal ideation and attempts, and has been placed in (or admitted himself to) psychiatric facilities and hospitals, receiving various psychoactive medications for DMS-V disorders including Antisocial Personality Disorder and Adjustment Disorder with Disturbance of Conduct.

This history is relevant to the §3553(a)(2) factors that the Court will consider in fashioning the sentence. The deleterious effects of extended solitary confinement on inmates are well-known

---

[1] The Guidelines, of course, cap the benefit for accepting responsibility at three points under §3E1.1, and all three points are typically earned by virtually every defendant who enters a guilty plea. But Mr. Murray has done more than that, and the Court should factor it into whatever sentence it decides to impose. Even before *Booker* the Second Circuit recognized a basis for a Guidelines departure for "extraordinary acceptance of responsibility." *United States v. Rogers*, 972 F.2d 489, 492 (2d Cir. 1992). To put it in the variance context, what Mr. Murray has done is important not just because it saves time, effort and resources for the Court and Government, but also because it directly impacts the §3553 factors. Robust and instantaneous acceptance of responsibility like Mr. Murray's indicates 1) a lesser need for the imposed sentence to promote respect for the law §3553(a)(2)(A), 2) a lesser need to deter future criminal conduct by the defendant §3553(a)(2)(C), and 3) a lesser need to provide correctional treatment §3553(a)(2)(D).

[2] He also lost visits, phone calls, and commissary for the entirety of his sentence.

[3] No public records or dockets from Family Court proceedings are available. However those sentences were concurrent, or partially concurrent, because Mr. Murray was released after serving only 18 months. In total, including the time from the 2008 family court case, Mr. Murray spent 32 months in juvenile custody. His "adult" custody began when he was 16 years 8 months old, with his arrest on August 29, 2012. He was continuously confined in adult prisons thereafter.

2

and amply documented. Those effects are more pronounced in cases involving inmates who are young, or who suffer from preexisting emotional disorders. Those affects can persist for years after the confinement ends. Those affects comprise a characteristic syndrome well-recognized in the literature—equally applicable to hostages and former prisoners of war—that includes anxiety, lack of impulse control, persistent symptoms of post-traumatic stress (such as flashbacks, chronic hypervigilance, and a pervasive sense of hopelessness), and a continuing pattern of intolerance of social interaction, leaving the individual socially impoverished and withdrawn, subtly angry and fearful when forced into social interaction. And for someone like Eliesha Murray, with a reported history of gang activity and a well demonstrated history of violence, and of being the victim of violence,[4] that damaged psychological profile was one in which he was deeply susceptible to the delusion that possessing a gun would be a good idea, notwithstanding its illegality.

Mr. Murray fully understands and accepts responsibility for his crime, knows that his crime carried the potential for harm, and knows that these crimes typically justify a term of incarceration. For the reasons which follow, however, I believe that his conduct does not call for imprisonment in this unusual case, the issue to which I now turn.

### The Defendant, his History and Characteristics

Mr. Murray knows nothing about his father and mother, does not know his birth name. His adoptive mother, Sarah Murray, reportedly knew his birth mother, and informally took custody of Eliesha at infancy, but that is the extent of his knowledge of his true parents. Sarah Murray was then 55 and had three grown children of her own (one, Wanda, late 20s, in the house), and one other adopted child, Ivy. Mr. Murray believes that he was eventually adopted formally by Ms. Murray.

Mr. Murray attended public schools in the Bronx, completing 4th grade but even then was known to be a behavior problem, a scholastic failure and truant. 

---

[4] Mr. Murray's face was slashed on Dec. 2, 2015 in upstate prison during his first year, while in solitary confinement. He was reported to his Parole officer that he had been attacked by group of men after leaving a program in March 2018.

[5] DOCCS records indicate that Murray threatened suicide. Mr. Murray denies threatening suicide, but does recall that he "went crazy."

3

██████████████████████████████████████████████████████████████████. By that time, Mr. Murray's mother was in end stage kidney disease and heart disease, confined to bed and breathing with supplemental oxygen. Mr. Murray was completely unsupervised, and behaved as one might expect a troubled 14 year-old boy newly-released from a prison to behave: by not attending programs or classes, and by getting into more trouble. A new family court warrant was issued for his noncompliance in June 2010. Sarah Murray died on July 3, 2010. Eliesha Murray, newly-orphaned, was arrested on the family court warrant a few days later and sent to Spofford Juvenile Center.[6]

Then fortune smiled on Mr. Murray—he does not know how—but shortly after arriving at Spofford, a counselor[7] took him from Spofford to his mother's funeral, and then deposited him back home and told him he was done with his sentence. Mr. Murray thought he had 18 months to serve, but didn't argue. And for about five months, Mr. Murray, completely on his own, continued doing as he pleased: no school, no programs, no reporting to Probation. On January 2011 he was arrested for possessing a gun and sentenced to six months. (PSR ¶ 30). ███████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ release in July 2012. He had already spent 32 months of his life in custody. He lasted three months at home in the Bronx after that before being arrested for the charge of gang assault.[8] He was still 16 years old, but on this occasion he was prosecuted as an adult, and remanded. And that, his first and only adult criminal case, would keep him in prison—almost exclusively in solitary confinement—until February 28, 2018.

At Rikers Island, Mr. Murry was initially housed in C-74, a facility for younger inmates, but was moved to an adult mental health SHU after he participated in a riot and then threatened suicide. There he spent nearly two years, from October 2012 until early May 2014, when he was

---

[6] Spofford Juvenile Center was the city's only secure juvenile facility. For decades, it was the subject of complaints for inhuman conditions, egregious abuse of detainees, and failure. It was closed in 2011, after a class-action lawsuit and a concession by the Correctional Association of New York that the facility had "a history of poor conditions and brutality against children." (*See*, https://web.archive.org/web/20150305204600/http://www.bronx.com/news/crime/1405.html.

[7] Mr. Murray remembers his name as Christoper Webb.

[8] Mr. Murray did not physically assault the victim. He saw the fight taking place and ran to join in, but as he got close, he saw police arriving and people fleeing, so he turned and fled. He was caught from behind and arrested along with five others. He was certainly guilty of the crime on a theory of aiding and abetting, NY Penal Law §110, and his eventual plea to the charge was knowing and voluntary.

4

offered a plea bargain: in exchange for his guilty plea to gang assault, he would receive a split sentence providing for 5 years of probation, after successful completion first of a 6-month program. (PSR ¶ 31.) That plea agreement also provided, however, that failure to complete the program would result in a "jail alternative" of 5 years. Mr. Murray absconded from the program, was rearrested five months later on November 6, 2014, and sentenced on December 12, 2014 to five years. (Exh. B, NYS Commitment.)

Mr. Murray arrived at Downstate Correctional Center on 12/30/2014. His cell was searched two weeks later, and a corrections officer found six postage stamps in a page of the institution rulebook that had been fashioned into a pocket by folding a torn page and sticking it together with toothpaste. Murray explained that he brought the stamps with him from Rikers, but prison officials wrote Murray up for possessing "unauthorized" postage stamps. The officer also found four handwritten pages of Mr. Murray's notes reflecting gang membership. He was found guilty at a hearing the next day and sentenced to solitary confinement for 30 days, along with the collateral deprivations of phone, commissary, and visitation that went along with it.

Still serving his time in solitary, he was sent to solitary at Franklin Correctional, near the Canadian border. There, he got into an altercation with another inmate, during which Murray slashed him with an improvised weapon. Another year was added to his solitary, and he also forfeited all recreation, packages, commissary, phones, visitation and good time. After imposition of that sanction, Mr. Murray was moved in June 2015 to the CAR Program, at Sullivan County Correctional.

The CAR Program was developed by DOCCS in 2014 to address the needs of inmates with intellectual deficits who had accumulated more than 30 days in disciplinary solitary confinement.[9] It was developed as an alternative to the standard 23-hour isolation treatment given to prisoners with intellectual or developmental disabilities, to permit more out-of-cell time, therapy, and access to programs. Inmates were allowed out of their cells for four hours of programming, intervention and rehabilitative services per day. On paper, it would seem to have been the perfect prison designation for Mr. Murray: ██████████████████████████████████████████████████████ and owed many unserved months of disciplinary solitary time. But Mr. Murray incurred three more disciplinary infractions (threw a bar of soap on 6/25/15, attempted to pass someone a note using a fishing line on 7/15/15, and possessed letter allegedly containing gang references on 12/31/15); for those violations, additional solitary confinement of 90, 30 and 180 days was imposed. He was sent to one of the NY DOCCS sixteen RCTPs (Residential Crisis Treatment Center) and then on to the Central New York Psychiatric Center ("CNYCP") in October 2015 for threatening to hoard medications and to strangle himself with a

---

[9] See NY DOCCS, CAR Manual. Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://doccs.ny.gov/system/files/documents/2021/12/correctional-alternative-rehabilitation-car-program-manual-12-21-17.pdf

bed sheet, and then returned to CAR two weeks later. (*See* Central N.Y. Psychiatric Center Evaluation ("CNYCP") Mental Illness Designation Form, Exh. C, p. 2). He was transferred from CAR, for disciplinary reasons, in January 2016. What officers told Mr. Murray about his transfer, however, was that he was being transferred because he was "too smart for CAR," that his IQ test revealed no intellectual deficit, and that DOCCS had concluded retrospectively that he was ineligible.

After being kicked out of the CAR Program, Mr. Murray spent the remaining 26 months of imprisonment cycling between DOCCS prisons Auburn, Downstate, Five Points Correctional and Sullivan County, from special housing (SHU) to special needs unit (SNU) to residential mental health unit (RMHU). He was placed in secure mental health facilities at least five times (09/16, 10/16, 11/16, 05/17 (twice). (*Id.*, p. 3.) He became preoccupied with returning to the CAR program, obsessed by the perceived injustice of being "too smart." He embarked on a letter-writing campaign (Exh. D) directed at DOCCS officials, asking for intervention to rectify this. Those officials responded in a series of bland, bureaucratic denials, including (on May 10, 2017) the assertion that he had been denied CAR because "your intellectual levels exceed the limit of potential candidates." (Letter from Ass't. Comm'r., Exh. E.) Mr. Murray, ▓▓▓▓▓▓▓▓▓▓▓▓ and whose only education since 4th grade took place, if at all, in secure juvenile detention facilities, and in any event ended in 9th grade), believed he was being lied to. The DOCCS Chronological Entry Sheet from Upstate, Auburn and Five Points (Exh. F), is replete with evidence of the intensity of his obsession:

| | |
|---|---|
| 09/08/16 | Discussed with offender criteria for Sullivan CAR and explained he doesn't meet the criteria. |
| 05/05/17 | [I]s agitated at times stating he should be in CAR program, stated he has been screened and at CAR program previously. States will look for paperwork and notify writer. |
| 05/08/17 | Continued agitation stating should be in CAR program. Encouraged continued patience re CAR. |
| 05/24/17 | Became agitated stating writer is not helping. |
| 06/06/17 | Inmate told by OMH that he will be getting cognitive testing. |
| 06/16/17 | Again asked about testing. Again explained when in tanks unable to be tested. |
| 06/27/17 | Agitated at no testing and continued pending MBR from 5/18/17 |

Upstate prison officials had come to the belief that Murray's suicide threats were empty and hi attempts were fake, efforts to manipulate prison officials into placing him into his preferred program. For example, even though CNYPC reported tha ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ it also concluded that he was simply malingering, e.g.:

6



Suffice to say that Mr. Murray was never allowed back into the CAR Program. Instead, he was cycled through various secure units within the above five prisons, transferred a total of ten times from one institution to another, from one SHU cell to another, until his release. He incurred nine more disciplinary infractions, for which he received 26 additional months in solitary confinement.[10] during that time. He was finally released to Parole on Feb. 28, 2018.

On NYS Parole, Mr. Murray's relentless pattern of self-destructive and maladaptive behavior, followed by yet more punishment, stopped. Mr. Murray was placed into treatment programs for mental health, drug abuse, employment counseling, individual therapy and group therapy. He was referred to a doctor ███████████████████████████████████ Rikers, but which DOCCS staff had apparently decided he didn't need. And over the next four years his life stabilized. He did not attempt suicide. He successfully completed all of his programs for NYS Parole. He became a father, got a job, found a Section 8-eligible apartment. He incurred no new criminal convictions.

### Effects of Long-Term Solitary Confinement

On March 31, 2022, one month <u>after</u> Eliesha Murray completed his parole term, the Humane Alternatives to Long-Term Solitary Confinement Act (HALT Act)(NY Correction Law §137 *et seq.*) went into effect. It was enacted in light of decades of research describing the long-term mental health ramifications of solitary confinement, and apparent racial disparity in how it was administered. It provided in part that inmates 21 and younger <u>were not to be placed in solitary confinement at all</u> and that even adults could not be so confined more than 15 consecutive days.

---

[10] These were in addition to the 27 months of solitary he had been sanctioned with before leaving CAR.

Out-of-cell programming was required to be offered to individuals in segregated confinement at least 4 hours per day, and at least 6 hours per day for individuals confined in residential rehabilitation units (RRUs), utilized by large facilities for incarcerated individuals who have reached the time limitations of segregated confinement. Those long-overdue limitations came too late for Mr. Murray.

The legislation was a recognition of what experts had long demonstrated: that long-term solitary confinement had consistently been shown to be associated with significant negative effects on mental health. Those effects include anxiety, depression, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia and psychosis. Those symptoms were so widespread among individuals former held in solitary that some experts labeled them "SHU Syndrome," with SHU standing for Special Housing Unit or Security Housing Unit. Stuart Grassian described SHU Syndrome as a "major, clinically distinguishable psychiatric syndrome." Grassian notes solitary confinement can cause extremely vivid hallucinations in multiple sensory modalities including visual, auditory, tactile, olfactory. Some other effects include dissociative features including amnesia, motor excitement with aimless violence and delusions. For those who, like Mr. Murray, enter the prison system already diagnosed with a mental illness, solitary confinement can significantly worsen their condition. Incarcerated individuals with mental health conditions often "decompensate in isolation, requiring crisis care or psychiatric hospitalization." The lack of human contact and sensory deprivation that characterize solitary confinement have been shown to cause permanent or semi-permanent changes to brain physiology, and those alterations to brain physiology can lead individuals to commit suicide. (*See,* Grassian, Stuart (January 2006). "Psychiatric effects of solitary confinement," Wash. U. J. L. & Pol'y. 22: 325; *available at* efaidnbmnnnibpcajpcglclefindmkaj/https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

Grassian's description of the effects and aftereffects of long-term solitary bear an uncanny resemblance to Eliesha Murray, as described contemporaneously by NYS prison officials. For example, according to Grassian, the absence of sensory stimuli in solitary creates a dissociative stupor, in which the prisoner's attention becomes stuck almost always on something unpleasant, or on some perceived injustice, that becomes the object of obsessive fixation. (Grassian, *supra,* p. 331.) And as both the CNYPC report and the DOCCS Chronological Entry Report, (Exhs. C, F) describe, Mr. Murray's fixated on getting back to CAR, on the injustice of having been removed from it, and his indignation that the removal was purportedly based on his being too smart. Second, the aftereffects of solitary are more pronounced in the young and mentally ill. (*Id.,* 332.) Third, the long-term aftereffects include an intolerance of social interaction, fear and paranoia. Those affects are particularly likely to persist even years after release in individuals who, like Mr. Murray, came into solitary confinement already suffering from emotional instability or disorder. (*Id.* 332-33.) Those affects <u>also</u> happen to be ones highly likely to motivate malign behavior, *i.e.* gun possession.

**Sentencing Argument**

Probation's recommendation for a below-Guidelines sentence is predicated, in part, on its conclusion—with which we concur—that Mr. Murray's early life experiences mitigated the offense conduct:

> The defendant has had a difficult life. His upbringing in an adopted family and being sent to juvenile detention at age 11 certainly effected the defendant negatively as he admitted to acting out with self-harm. He has spent a great deal of his life in custody or on community supervision, including a large portion of time in solitary confinement. It does not appear that he was afforded opportunities in those institutions to receive education or job training. His mental health concerns have gone untreated for over two years.

It is straightforward to see in retrospect how the circumstances of Mr. Murray's childhood years shaped and precipitated his entry into the world of street life and criminality. By that I mean that he grew up, literally, in prison. It began when he was 12 at Spofford—now closed for brutality toward inmates—and ended at 22 after he completed years of solitary confinement, confinement that would now be illegal under New York law.[11] The trajectory began for him, in other words, when he was a child. It is a given that "children are different," (*Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2470, 183 L.Ed.2d 407 (2012)), and that "laws that fail to take youthfulness into account at all would be flawed." (*Graham v. Florida,* 560 U.S. 48, 76, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the individual; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597 (2007).

---

[11] Mr. Murray continued to act in prison in his early 20s as a very good example of how the Supreme Court described juvenile delinquents in *Roper v. Simmons*, 543 U.S. 551, 569-70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), where it identified three salient characteristics: a "lack of maturity and an underdeveloped sense of responsibility" that frequently leads to "impetuous and ill-considered actions and decisions," an increased susceptibility to "negative influences and outside pressures," including a reduced ability to control or escape their environments, and a "less fixed" character that is "not as well formed as that of an adult."

Of the §3553(b) objectives, providing just punishment, reflecting the seriousness of the offense, promoting respect for the law, and providing general deterrence to others who might engage in criminality, are all plainly relevant to Mr. Murray's admitted misconduct. As to those, however, I believe that sending him to prison is unnecessary and unwarranted.

**Conclusion**

The justice system envisions that all who emerge from it will never return, will find gainful employment, will succeed in their life's endeavors. Often, circumstances on the outside of a prison—poverty, criminal record, lack of education, lack of opportunity—make this extremely difficult. Some like Mr. Murray also suffer from the aftereffects of their prior prison experiences. But Mr. Murray has not been idle. He is employed, he supports his children, has taken many self-betterment courses and attended substance abuse treatment, he no longer requires psychoactive medications, has incurred no bail violations, and has lived without incident. He has robustly participated in programming with The Focus Forward Project and Exodus; Mr. Murray's graduation was last week.[12]

For all of these reasons, I believe that a sentence below applicable range would be sufficient to achieve the objections of sentencing under §3553(a)(2).

Respectfully submitted,

David Wikstrom

---

[12] His graduation certificate and completion certificates from both Focus Forward will be provided as soon as received. The Focus Forward Project's letter on Mr. Murray' behalf is attached as Exhibit G.

10